### UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **PLAINTIFF** | : | |
| **Meredith McKelvey,** | : | |
| | : | **No. 3:20-cv-1591 (VLB)** |
| **v.** | : | |
| | : | |
| **DEFENDANT** | : | **June 30, 2022** |
| **Louis DeJoy.** | : | |
| | : | |
| | : | |
| | : | |
| | : | |

### MEMORANDUM OF DECISION ON
### DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [DKT. 23]

Plaintiff Meredith McKelvey is a 78-year-old Black woman who has loyally worked for the United States Postal Service ("USPS") for over 50 years.  On May 5, 2020, Ms. McKelvey was performing her duties as a specialty clerk in Hartford Office's Registry Cage when one of her supervisors, Robert Peluse, yelled at and threatened her for 30 minutes when she refused to perform a task outside her job description.  Ms. McKelvey contends that this incident constituted employment discrimination—based on her race, color, and age—in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e-2000e-17, and the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. §§ 621-634. Specifically, Ms. McKelvey alleges two Counts: Count One, "hostile work environment and disparate treatment" in violation of Title VII; and Count Two, "disparate and harassive conduct" in violation of the ADEA.

On behalf of the USPS, Defendant Postmaster General Louis DeJoy moves for summary judgment on both Counts.  For the following reasons, summary judgment is GRANTED.

I.     FACTUAL BACKGROUND

The following facts are taken from the Local Rule 56 statements of material facts and evidence cited by the parties. The facts are read in the light most favorable to the non-movant, Ms. McKelvey.  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986).  This is prefaced with the materiality rule: "[T]he substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248.  A dispute of an issue of material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.*

Meredith McKelvey is a 78-year-old Black woman who has worked for USPS for more than 51 years.    (Dkt. 24-2 (56(a)(1) Stmt.) ¶ 1; Dkt. 26-1 (56(a)(2) Stmt.) ¶ 1.)  For approximately 15 years, Ms. McKelvey worked in the Registry cage as a specialty clerk in the Hartford Processing and Distribution Center.  (Dkt. 24-2 ¶ 2; Dkt. 24-5 (Mot. Summ. J. Ex. C, McKelvey Dep.) at 22:20-22; Dkt. 26-1 ¶ 2).  The Registry case contains high value, insurable items that are the most expensive type of mail.  (Dkt. 24-2 ¶ 51; Dkt. 26-1 ¶ 51).  Although others work in the Registry cage, Ms. McKelvey is often the only employee working in the space.  (Dkt. 24-5 at 22:8-19; 36:22-37:4.)

2

On May 5, 2020, Acting Manager of Distribution Operations Al Povalitis (and Ms. McKelvey's immediate supervisor) approached Ms. McKelvey on behalf of Lead Manager of Distribution Operations Robert Peluse, a white man in his 50s, who requested that she track down customer information.  (Dkt. 24-2 ¶ 7; Dkt. 26-1 at Part III ¶¶ 3, 30.)  According to Ms. McKelvey's deposition testimony, she told Mr. Povalitis that speaking to customers was not part of her role.  (Dkt. 24-5 at 27:9-12.)  Mr. Povalitis clarified that Mr. Peluse "want[ed] this information <u>for</u> a customer," but she maintained that the request fell outside her job duties.  (*Id.* at 28:19-25 (emphasis added).)  She explained that the proper protocol was to have Mr. Peluse call customer service and customer service would contact the Registry, after which Ms. McKelvey would put the information together.  (*Id.* at 27:21-25.)  She further explained that she was not authorized to perform the tasks Mr. Peluse requested, and Mr. Povalitis acknowledged her explanation "made sense."  (*Id.* at 28:1-5.)

About 25 minutes later, Mr. Peluse approached Mr. McKelvey about the information he needed.  (Dkt. 24-2 ¶ 10; Dkt. 26-1 ¶ 10).  Ms. McKelvey again stated she was not authorized to perform the tasks he requested.  (Dkt. 24-2 ¶ 11; Dkt. 26-1 ¶ 11).  Mr. Peluse told her he was "giving her an order" but she still refused to do it.  (Dkt. 24-2 ¶ 12; Dkt. 26-1 ¶ 12).  Ms. McKelvey testified that Mr. Peluse was not "authorized" to "come in there and tell [her] what to do."  (Dkt. 24-2 ¶¶ 11, 14; Dkt. 26-1 ¶ 11, 14).  Mr. Peluse raised his voice and threatened her.  (Dkt. 24-2 ¶¶ 18, 34; Dkt. 26-1 ¶¶ 18, 34).  She testified, "He just really got huffing and puffing and saying I'm in charge here, this and that.  So make a long story short, it scared me because of his body language and his voice and everything."  (Dkt. 24-5 at 29:12-17; Dkt. 26-

1 at III ¶ 6.)   According to Ms. McKelvey, at that time she used a rolling cart, in which she kept her food and other items, to alleviate pain from a past shoulder injury.  (Dkt. 24-5 at 29:25-30:6.)  Mr. Peluse saw it and said, "I don't know what that's doing here, but I know one thing, you better get it out of here."  (*Id.* at 30:7-13.)  Ms. McKelvey testified that Mr. Peluse threatened to close the Registry cage down—stating, "I'm taking you out of here"—and that he would put her on the window because she was "not doing nothing here." (*Id.* at 30:17-23.)

Ms. McKelvey felt "very threatened," as if she was in a "bad nightmare."  (*Id.*) She requested Marcia Brooks, her union steward, come to the Registry cage to serve as a witness.  (Dkt. 24-2 ¶ 29; Dkt. 26-1 ¶ 29; Dkt. 24-5 at 29:18-25).  Ms. Brooks observed the "tail end" of the incident approximately two to three minutes.  (Dkt. 24-6 (Mot. Summ. J. Ex. D, Brooks Dep.) at 45:18-46:2.).  During her deposition, Ms. Brooks corroborated the substance of Ms. McKelvey's testimony as described above.  (*See id.* at 34:5-36:14, 39:8-40:2.)  In addition, Ms. Brooks heard Mr. Peluse say, "I'm the lead MDO, and you're going to do as I tell you to do."  (*Id.* at 30:17-20.) She also heard Mr. Peluse say that Ms. McKelvey only does one hour of work a day. (*Id.* at 39:16-18.)   According to Ms. Brooks, Ms. McKelvey "maintained her composure" and stood there quietly, "in a professional manner," while Mr. Peluse yelled at her.  (*Id.* at 33:11-25.)  The entire incident lasted 30 minutes.  (*Id.* at 50:17-51:5; Dkt. 26-1 at III ¶ 12.)

When asked to reflect on the incident, Ms. McKelvey testified she was "flabbergasted," felt "verbally assaulted," and that Mr. Peluse "scared the crap out of [her]."  (Dkt. 24-5 at 30:24-31:3; Dkt. 26-1 at III ¶ 6-9)  She explained,

> Because I'm not a person that's problematic. I know I'm a hard worker, and my record stands for itself. I said 51 years, this is not what I'm here for. This is not part of the postal service. This is not how they treat their employees. Just never experienced anything like that. Like I said, it frightened me. I said I need a witness to this.

(Dkt. 24-5 at 31:3-8; Dkt. 26-1 at III ¶¶ 9-10.)  As a result of this incident, Ms. McKelvey experienced elevated blood pressure, depression, and she no longer felt happy at work.  (Dkt. 24-5 at 57:9-61:11; Dkt. 26-1 at III ¶¶ 13-16.)  These symptoms lasted for approximately six or seven months.  (Dkt. 24-5 at 57:9-61:11; Dkt. 26-1 at III ¶¶ 13-16.)

Ms. McKelvey testified that she perceived Mr. Peluse's actions to be discriminatory.  (Dkt. 24-2 ¶ 17; Dkt. 26-1 ¶ 17).  She explained:

> Well, I felt when he was there – first of all, he raised his voice. I'm in charge here. You do what I tell you to do. I'm the MDO here. It was like, I just feel, like, where did he think he's at? It felt to me, this is how I felt, like maybe it seems like he's on the plantation talking to a slave or something. He's not talking to a 75-year-old woman with my background, with my work ethic. You're talking to me? No, no. You're in the wrong place with the wrong person. That's what I'm saying to myself. I felt discriminated against. That made feel discriminated against. It was like no, this is not – like I said, that's not what the post office stands for and has always stood for. Like I said, I can't be the first person he went off like that to. To me, like I said, I never had dealings with him. To me, what I said to myself, this has got to be the real Bob. This has got to be the real Bob, an undercover racist.

(Dkt. 24-5 at 38:25-39:18.)  Ms. McKelvey admitted that he did not explicitly say anything about her race, color, or age.  (Dkt. 24-2 ¶ 19; Dkt. 24-5 at 70:25-72:13; Dkt. 26-1 ¶ 19).

Ms. McKelvey admitted that the May 5, 2020 incident was a one-time, isolated event.  (Dkt. 24-2 ¶¶ 17, 21; Dkt. 26-1 ¶¶ 17, 21).  Prior to this incident, she did not

have any face-to-face interactions with Mr. Peluse.[1]  (Dkt. 24-2 ¶ 17; Dkt. 26-1 ¶ 17.)
Nor did she have any subsequent incidents with Mr. Peluse.  (Dkt. 24-2 ¶ 17; Dkt.
26-1 ¶ 17.)  She admitted that no employment actions were taken against her after
the May 5 incident.  (Dkt. 24-2 ¶ 22; Dkt. 26-1 ¶ 22.)  Meaning, she was not
reassigned, her job was not shut down, and her wages or hours were never
changed.  (Dkt. 24-2 ¶ 22; Dkt. 26-1 ¶ 22.)  She did not witness Mr. Peluse interact
with other individuals, due to the isolation of her job.  (Dkt. 24-5 at 36:20-37:9.)
Apart from Mr. Peluse, Ms. McKelvey never had any issues with any supervisors,
including Mr. Povalitis who she described as an "excellent supervisor."  (*Id.* at
32:16-33:4.)

On May 14, 2020, Ms. Brooks held a "step one" pre-grievance meeting  with
Mr. Povalitis on behalf of Ms. McKelvey against Mr. Peluse. (Dkt. 24-6 at 31:10-33:8,
37:11-18.)  Ms. Brooks initiated the grievance process on her own but with Ms.
McKelvey's knowledge.  (*Id.* at 37:15-18.)  Ms. Brooks did not pursue the matter
past step one after Ms. McKelvey informed her that she would be retaining a lawyer.
(*Id.* at 38:22-39:7.)

Ms. Brooks reflected on Mr. Peluse's conduct during her deposition.  She
confirmed his conduct was unprofessional, outrageous, shocking, and surprising.
(*Id.* at 42:21.)  With respect to her 35 years at USPS, she stated, "I haven't had any
other supervisor or managers in my career act that way" as Mr. Peluse acted
against Ms. McKelvey.  (*Id.* at 43:18-44:3.)  When asked whether she believed Mr.

---

[1] Mr. Peluse testified that he interacted with Ms. McKelvey only a few times prior to
the incident.  (Dkt. 24-2 ¶ 52; Dkt. 26-1 ¶ 52).

Peluse was discriminating against Ms. McKelvey on the basis of her race, color, or age, Ms. Brooks responded in the negative.  (*Id.* at 48:8-49:13.)

Ms. Brooks previously filed an EEO Complaint against Mr. Peluse in July 2018, contending he discriminated against her on the basis of her race.  (*See id.* at 23:25-29:13; Dkt. 26-1 at III ¶ 19.)  She testified during her deposition that Mr. Peluse approached her about a union/management overtime scheduling issue.  (Dkt. 24-6 at 23:25-29:13.)  Mr. Peluse stood over her in a way that made her "uncomfortable," "embarrassed," and "disrespected," and said, "[Y]ou don't take your instructions from the union.   You take your instructions from management.   Do you understand?" (*Id.*)  He kept yelling, "Do you understand?" (*Id.*)  Ms. Brooks initially e-mailed Mr. Peluse her concerns about the interaction, but when he did not respond she ultimately filed an EEO charge.  (*Id.*)  Ms. Brooks alleged that white clerks were treated differently than her, because of their race and color.  (*Id.*)  After an investigation was initiated, he apologized verbally and in writing.  (*Id.*)

Another individual, Bishop Bibawy, complained of workplace discrimination.[2]  (Dkt. 24-7 (Mot. Summ. J. Ex. E, Peluse Dep.) at 132:12-18.)  Mr. Bibawy is Egyptian.  (*Id.* at 133:24-134:10.)  Mr. Peluse testified that it was possible Mr. Bibawy complained about Mr. Peluse not promoting him, but Mr. Peluse subsequently helped him get ready to apply for a supervisor position.  (*Id.* at 133:1-8.)

Ms. McKelvey initiated the Pre-Complaint Counseling process on June 24, 2020.  (Dkt. 24-2 ¶ 5; Dkt. 26-1 ¶ 5.)   By September 18, 2020, the USPS Equal

---

[2] **Evidence does not clarify the protected class(es) Mr. Bibawy asserted.**

Employment Opportunity Office ("Agency") denied her complaint and issued a "Right to Sue" letter.  (Dkt. 24-2 ¶ 6; Dkt. 26-1 ¶ 6).

## II.    LEGAL STANDARD

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of proving that no genuine factual disputes exist. *See Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010). "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought." *Id*. (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). This means that "although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000); *see Welch-Rubin v. Sandals Corp.*, No. 3:03-cv-00481, 2004 WL 2472280, at *4 (D. Conn. Oct. 20, 2004) ("At the summary judgment stage of the proceeding, [the moving party is] required to present admissible evidence in support of their allegations; allegations alone, without evidence to back them up, are not sufficient.") (citing *Gottlieb*, 84 F.3d at 518); *Martinez v. Conn. State Library*, 817 F. Supp. 2d 28, 37 (D. Conn. 2011).   Put another way, "[i]f there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party, summary judgment must be denied." *Am.*

*Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH*, 446 F.3d 313, 315–16 (2d Cir. 2006) (internal quotation marks and citation omitted).

A party who opposes summary judgment "cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cnty of Orange*, 84 F.3d 511, 518 (2d Cir. 1996). Where there is no evidence upon which a jury could properly proceed to find a verdict for the party producing it and upon whom the onus of proof is imposed, such as where the evidence offered consists of conclusory assertions without further support in the record, summary judgment may lie. *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 726–27 (2d Cir. 2010).

## III.   DISCUSSION

Ms. McKelvey brings two Counts that each assert two distinct types of employment discrimination: (1) hostile work environment and disparate treatment based on race and color, in violation of Title VII; and (2) "disparate and harassive conduct" based on age, in violation of the ADEA.[3]  (Dkt. 1 ¶¶ 13, 18.)  Hostile work environment and disparate treatment claims require different analyses because they are subject to two different legal standards.  *Rasmy v. Marriott Int'l Inc.*, 952 F.3d 379, 389 (2d Cir. 2020) (distinguishing disparate treatment claims from hostile work environment claims).  Accordingly, the Court will first address Ms.

---

[3] Because Ms. McKelvey incorporates the Count One paragraphs into her Count Two allegations, the Court construes "disparate and harassive conduct" as disparate treatment and hostile work environment.

McKelvey's disparate treatment claims under Title VII and the ADEA, and will next address the hostile work environment claims under these statutes.

A. <u>Discriminatory Treatment</u>

Both Title VII and ADEA claims are subject to the familiar, three-part burden shifting framework under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Vega v. Hempstead Union Fere Sch. Dist.*, 801 F.3d 72, 82–83 (2d Cir. 2015) (Title VII disparate treatment); *Bucalo v. Shelter Island Union Free Sch. Dist.*, 691 F.3d 119, 128–29 (2d Cir. 2012) (ADEA disparate treatment); *Fu v. Consolidated Edison Co. of New York*, 855 F. App'x 787, 789 (2d Cir. 2021) ("Discrimination claims under both Title VII and the ADEA are analyzed under the *McDonnell Douglas* burden-shifting framework.").

Under the *McDonnell Douglas* framework, a plaintiff must first establish her *prima facie* case of discrimination by showing: "(1) she is a member of a protected class; (2) she is qualified for her position; (3) she suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination." *Vega*, 801 F.3d at 83. Once the plaintiff satisfies this initial step, the burden then shifts to the defendant to "'articulate some legitimate, nondiscriminatory reason' for the disparate treatment." *Id.* (quoting *McDonnell Douglas*, 411 U.S. at 802). If a defendant can satisfy this second step, the burden then "shifts back to the plaintiff to prove that the employer's reason was in fact pretext for discrimination." *Id.*

Here, the analysis starts and ends at step one. It is undisputed that Ms. McKelvey did not suffer an adverse employment action after the May 5, 2020

incident.[4]   (*See* Dkts. 24-2 ¶ 22 (stating plaintiff admits no adverse action); 26-1 ¶ 22 (admission).)   "Where the undisputed facts reveal that there is an absence of sufficient proof as to one essential element of a claim, any factual disputes with respect to other elements of the claim become immaterial and cannot defeat a motion for summary judgment."   *Weiss v. Nat'l Westminster Bank, PLC*, 993 F.3d 144 (2d Cir. 2021).   Because Ms. McKelvey cannot establish her *prima facie* disparate treatment claim as a matter of law, there is no triable issue of fact. Accordingly, the Court grants summary judgment as to the Title VII and ADEA discriminatory treatment claims.

**B. Hostile Work Environment Under Title VII and the ADEA**

As with discriminatory treatment claims, both Title VII and the ADEA are subject to the same hostile work environment standard.   *See Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir. 2003).   An employer creates a hostile work environment when "the work environment is permeated with discriminatory intimidation, ridicule, and insult … that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment … so long as there is a basis for imputing the conduct that created the hostile environment to the employer."   *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 546 (2d Cir. 2010).   The hostile work environment test includes both an objective and subjective

---

[4] Neither party briefed discriminatory treatment, even though the term is referenced in each Count of the Complaint.   Rather, the parties simply acknowledged in the 56a Statements that Ms. McKelvey did not suffer an adverse action.   Accordingly, to the extent Ms. McKelvey initially intended to assert a disparate treatment claim separate from her hostile work environment claim, she recognizes in her summary judgment briefing that the claim is not viable.

component: the severity and pervasiveness must rise to the level "to create an objectively hostile or abusive work environment," and the employee must also "subjectively perceive that environment to be abusive."  *Rasmy*, 952 F.3d at 387 (internal quotation marks omitted).   "It is axiomatic that to prevail on a claim of hostile work environment …, the plaintiff must establish that the abuse was based on [the protected class]."  *Kaytor*, 609 F.3d at 547.

In moving for summary judgment, Defendant asserts three main arguments.  First, the misconduct constituting an allegedly hostile work environment is neither severe nor pervasive.   Second, the environment is neither objectively nor subjectively hostile or abusive.   Third, even if it were, the alleged abuse is not based on Ms. McKelvey's race, color or age.

Ms. McKelvey disagrees.  Specifically, she first contends the incident was "severe" because Mr. Peluse yelled at her for 30 minutes and that it was "pervasive" insofar as Mr. Peluse's "tirade" was related to previous instances in which Ms. McKelvey had been criticized for refusing to contact customers.  (Dkt. 26-2 at 7-8.)  She also states that such conduct is sufficient to satisfy both the objective and subjective prongs.   Ms. McKelvey last argues that Mr. Peluse's conduct was motivated by discriminatory animus, because two other individuals previously filed grievances against him for harassing conduct: a 58-year-old Black woman and a man (age unknown) born in Egypt.  *See id.* at 12.

1.    *Objective Component of "Severe or Pervasive Conduct"*

To establish severe or pervasive conduct, a plaintiff must show "either that a single incident was extraordinarily severe, or that a series of incidents were

'sufficiently continuous and concerted' to have altered the conditions of her working environment." *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002). In evaluating the severity and pervasiveness, the Court must assess "the totality of the circumstances, including: the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the victim's [job] performance." *Rasmy*, 952 F.3d at 387 (internal quotation marks omitted).

As an initial matter, the Court finds that USPS did not subject Ms. McKelvey to pervasive conduct that was "sufficiently continuous and concerted" to alter her employment. *See Alfano*, 294 F.3d at 374. Ms. McKelvey testified that she had never interacted with Mr. Peluse prior to the May 5, 2020 incident, and she did not interact with him afterwards. (Dkt. 24-5 at 32:2-18.) Ms. Brooks testified that Mr. Peluse criticized Ms. McKelvey for refusing to do work outside the scope of her job activities, but Ms. McKelvey was not disciplined. (*See* Dkt. 24-2 at 8.) While Ms. McKelvey states that Mr. Peluse and Ms. Brooks both testified to Mr. Peluse having "negative employment interactions" with Ms. McKelvey prior to May 5, 2020, she did not recall them and she does not argue that these other incidents were so pervasive they created an abusive environment. Moreover, there is no evidence in the record that any other supervisor or coworkers subjected her to hostile or abusive treatment.[5]

---

[5] A plaintiff does not need to be "the target of other instances of hostility in order for those incidents to support her claim." *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000), *superseded by Natofsky v. City of New York*, 921 F.3d 337, 354 (2d Cir. 2019) *on other grounds*. To the extent Ms. McKelvey contends that Ms. Brooks' and Mr. Bibawy's discrimination grievances are evidence of "an overall

In the absence of the requisite "pervasiveness," Ms. McKelvey can only establish a hostile work environment if the May 5, 2020 incident was "extraordinarily severe."   *See Alfano*, 294 F.3d at 374.   From the Court's assessment of Second Circuit precedent, this bar appears to be troublingly high. For example, the Second Circuit has acknowledged that a combination of a racial epithets <u>and</u> physical assault or threats could constitute a single, "extraordinarily severe" incident.  *See Patterson v. Cnty of Oneida, New York*, 375 F.3d 206, 230 (2d Cir. 2004) ("Although a single incident ordinarily will not give rise to a cognizable claim for hostile work environment, this alleged event included not only racial remarks but also a physical assault in which Patterson was punched in the ribs and was temporarily blinded by having mace sprayed in his eyes."); *Rivera v. Rochester Genesee Regional Transp. Auth.*, 743 F.3d 11, 24 (2d Cir. 2014) ("The use of racially offensive language is particularly likely to create a hostile work environment when, as here, it is presented in a "physically threatening" manner.") Yet the Second Circuit apparently limits facially-neutral comments to serving only as circumstantial evidence supporting overt comments or acts of pervasive conduct.  *See, e.g., Kaytor*, 609 F.3d at 457-48 ("Circumstantial evidence that facially sex-neutral incidents were part of a pattern of discrimination on the basis of gender may consist of evidence that the same individual engaged in multiple acts of harassment, some overtly sexual and some not.") (quotation marks

---

'hostile or abusive environment" exacerbating her individual hostile environment, *see id.* at 571, these two incidents—one that took place two years prior and the other that took place on an unknown date—are insufficient to establish a "pervasive" hostile or abusive environment.

omitted); *Daniel v. T&M Protection Resources, LLC*, 689 F. App'x 1, at *3 (2d Cir. 2017) ("Daniel's supervisor's inquiry as to whether Daniel stole a computer—combined with the supervisor's overtly racist remarks—should not have been ignored by the district court.").

After reviewing the evidence in this case, the Court is appalled by Mr. Peluse's 30-minute tirade directed against a 51-year veteran of USPS.  Ms. McKelvey has had an outstanding career serving the federal government for about as long as Mr. Peluse has been alive.  (Dkt. 24-2 ¶ 1; Dkt. 26-1 ¶ 1.)  Her record is squeaky clean.[6]  Yet without having hardly any previous interactions with her, Mr. Peluse yelled at her for 30 minutes in such a threatening manner that her union representative—who felt his conduct was so unprofessional, outrageous, shocking, and surprising—*sua sponte* initiated the grievance process.  (Dkt. 24-5 at 29:12-17, 30:17-23, 50:17-51:5; Dkt. 26-1 at III ¶¶ 6, 12.)  Mr. Peluse was so threatening that Ms. McKelvey, a 78-year-old Black woman who had never complained of discrimination against her employer in over 50 years, felt compelled to file an EEO complaint.  He embarked on this tirade simply because she said she was not authorized to perform a task he was asking of her.  (Dkt. 24-2 ¶¶ 11, 14; Dkt. 26-1 ¶ 11, 14).  Mr. Peluse apparently did not stop to consider that his subordinate with 50 years of institutional knowledge and a stellar reputation might be pushing back on his "direct order" for a reason.  Instead, he raised his voice;

---

[6] Ms. McKelvey testified that, during her 50-plus years of employment, she only ever had two issues: (1) an EEO complaint she filed to obtain $2,000 of overtime she was denied; and (2) a single written warning from 1989.  (Dkt. 24-5 at 22:23-25:13.)  The fact that defense counsel had to dig up a warning from 1989, which Ms. McKelvey hardly remembered, is indicative of her impressive years of service.

threatened that he would close down her job and move her to another position; repeatedly told her, "I'm in charge here!;" said, "I'm the lead MDO, and you're going to do as I tell you to do;"  incorrectly claimed she only worked an hour a day; and ordered her to remove her personal belongings from the Registry cage.   (Dkt. 24-5 at 29:12-30:23; Dkt. 24-6 at 30:17-20, 39:16-18; Dkt. 26-1 at III ¶ 6.)   His utter disrespect and mistreatment of Ms. McKelvey for no valid reason is the exact type of "extraordinarily severe" conduct against which employment statutes should be protecting.

But the Court must abide by the dictates of binding precedent.  There is long-standing jurisprudence that employment statutes do not create a "general civility code."  *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998).  While a supervisor yelling at a subordinate for an extended period of time is undoubtedly reprehensible, standing alone it cannot be considered "extraordinarily severe." *C.f. Littlejohn v. City of New York*, 795 F.3d 297, 321 (2d Cir. 2015) (acknowledging that yelling and talking down to a plaintiff did not establish "severe or pervasive" conduct); *Boyar v. Yellen*, 2022 WL 120356, at *3 (2d Cir. Jan. 13, 2022) (stating that several allegedly abusive incidents, including when the supervisor "yelled at him demanding his employee identification number 'now'" was neither severe nor pervasive in the aggregate); *see generally Albert-Aluya v. Burlington Coat Factory Warehouse Corp.*, 2011 WL 13176100, at *6 (N.D. Ga. Feb. 1, 2011) (granting summary judgment for hostile work environment claim when plaintiff stated she was screamed at for an hour and a half about her job performance).

The Court finds that *Campbell v. Bottling Group LLC*, 814 F. App'x 630 (2d Cir. 2020), a Second Circuit summary order from 2020, instructive here.   The *Campbell* plaintiff argued he was subjected to a hostile work environment on the basis of his race, because his supervisor told him "that there was a 'stink' on him … due to [his] performance issues."   *Id.* at 633.   The Second Circuit reasoned, "Even if we assume that the statement had racial overtones, this single remark falls below the 'extraordinarily severe' standard for a hostile work environment claim based on a single incident."   *Id.*   Other courts have agreed that performance criticism, without more, cannot rise to "extraordinarily severe."   *See, e.g., Langlois v. Hartford Bd. of Educ.*, 831 F. App'x 548, 552 (2d Cir. 2020) (stating "criticism related to classroom management and teaching" as well as "isolated comments" by the principal about matching the race of students with teachers did not rise to the level of actionable "severity").

Like with *Campbell*, this case is centralized around a single incident in which the "bad actor" did not explicitly use a racist, colorist, or ageist remark.   Ms. Brooks, the union representative, witnessed Mr. Peluse say, "You don't do anything around here anyway," (Dkt. 24-6 at 56:13-15), which could be construed as having racist or ageist overtones.   Specifically, Mr. Peluse's comment is another way of expressing the racist stereotype that Black people are lazy, a characterization that slaveowners used to justify beating enslaved people who failed to meet their excessive labor demands.   However, in implementing the above precedent and the Second Circuit's reasoning in *Campbell*, a comment such as this

17

is not sufficient to establish a single incident that is "extraordinarily severe."  *See Campbell*, 814 F. App'x at 633.

Regrettably, the Court finds that Ms. McKelvey did not suffer "extraordinarily severe" conduct. Therefore, summary judgment must be granted on these grounds.

> 2.  *Subjective Component of "Severe or Pervasive" Conduct*

Because Ms. McKelvey fails to show a triable issue of fact that her employer subjected her to an objectively hostile work environment, the Court need not address the subjective component of the test.  The Court notes that, with respect to Mr. Peluse's tirade, Ms. McKelvey felt the following:

> I was mentally and physically hurt, mentally and physically, both of them.  Because I never experienced anything like that.  I wasn't prepared for it, that is for sure, and it hurt me more than I felt.  To me, it had a lot of overtones to it.  Like, somebody my age and somebody my color.  It's, like, I'm on the planation.  You a slave, you do what the hell I want you to do.  I'm in charge here.

(Dkt. 24-5 at 39:3-7.)  Her testimony would satisfy the subjective component.

> 3.  *Discriminatory Animus*

Lastly, it is undisputed that Mr. Peluse never used racist, colorist, or ageist language when he yelled at Ms. McKelvey on May 5, 2020.  The only evidence in the record concerning Mr. Peluse's criticisms of Ms. McKelvey are related to job performance, which the parties agree did not lead to discipline.  Ms. Brooks, who witnessed the incident, did not believe Mr. Peluse's tirade was discrimination on the basis of race, color or age.  (Dkt. 24-6 at 48:8-49:13.)   Ms. McKelvey, on the other hand, argues that discriminatory racial animus is evidenced by two other

individuals—Ms. Brooks, a 58-year-old Black woman and Mr. Bibawy, an Egyptian man—who filed discrimination complaints against Mr. Peluse.

The haunting question here is: what possessed Mr. Peluse to believe that he was entitled to threaten, intimidate, and degrade a 78-year-old -50-year veteran of USPS for insisting on doing her job and not someone else's. This is a question that cannot go to the jury because Mr. Peluse did not disclose his motivation overtly. This standard would be just and adequate in a "post-racial" America, but regrettably that is not the America in which we live.  We do not live in the overtly racist America of the Jim Crow era. Until recently, discriminatory mentality has been largely underground, it is manifest in a more subtle and sophisticated manner since passage of the civil rights laws of the 1960s. We did not doubt the motives of a white man who opened fire in an African American church in South Carolina or a man who punched an Asian woman in the face on the streets of New York City, yet not a racist word was spoken. The law does not protect what it is intended to protect if juries can only consider cases in which the defendant committed multiple overt racist or agist acts, and as a result few defendants will be held accountable for their discriminatory conduct.

Based on the Court's above analysis, Ms. Brooks' testimony, and these two complaints, the Court finds that the issue of discriminatory animus is a tough call. On balance, the Court would find that the totality of the evidence and these comparators' complaints are sufficient to create a triable issue of fact concerning discriminatory animus.  *See Alfano*, 294 F.3d at 377-78.

**IV.     CONCLUSION**

For the above reasons, the Court grants summary judgment as a matter of law.  The Clerk is directed to close this case.

**IT IS SO ORDERED**

_____

**Hon. Vanessa L. Bryant
United States District Judge**

**Dated at Hartford, Connecticut: June 30, 2022**